NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

VISTA HILL FOUNDATION, d/b/a Vista Hill Hospital, Respondent.

No. 79–7262.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 2, 1980.

Decided Dec. 15, 1980.

Rehearing Denied Feb. 27, 1981.

Richard B. Bader, Washington, D. C., for petitioner.

James Allen Bowles, Hill, Farrer & Burrill, Los Angeles, Cal., argued, for respondent; Edwin H. Franzen, Los Angeles, Cal., on brief.

Before CHOY and ALARCON, Circuit Judges, and SOLOMON,* District Judge.

ALARCON, Circuit Judge:

The National Labor Relations Board petitions this Court for enforcement of its order directing respondent Vista Hill Hospital (Hospital) to collectively bargain with the Service Employees International Union (Union). The Hospital concedes that it has refused to bargain with the Union, but contends that the Union should not have been certified as an exclusive bargaining unit due to alleged irregularities in the representation election. Unless the Hospital can prevail before this court in its challenge to the validity of the election, its admitted refusal to bargain constitutes a clear violation of Section 8(a)(5) and (1) of the National Labor Relations Act (Title 29, United States Code, Sections 158(a)(5) and (1)),[1] and the Board is entitled to enforcement of its order. *NLRB v. Heath Tec Division/San Francisco*, 566 F.2d 1367, 1369 (9th Cir. 1978), *cert. denied*, 439 U.S. 832, 99 S.Ct. 110, 58 L.Ed.2d 127 (1979).

## I. *FACTUAL BACKGROUND*

On November 22, 1977, the Union filed a representation petition with the Board seeking certification as the exclusive bargaining representative of specified employees of the Hospital. Thereafter, the parties entered into a Stipulation for Certification Upon Consent Election, which defined the appropriate unit to be represented by the Union and which set the election for January 10, 1978. The election was held as scheduled and resulted in 40 votes being cast in favor of the Union and 32 votes against.

On January 17, 1978, the Hospital filed objections to the conduct of the election

---

* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

1. Section 158(a), subsections (1) and (5), provide that:

"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 157 of this title . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

alleging that the union observer, Mark Collins, "engaged in electioneering consisting at least in part of interrogation of prospective voters and solicitation of favorable votes" for the Union. The Board's Regional Director conducted an investigation of the Hospital's objections and issued a report on March 1, 1978, recommending that the Board overrule the Hospital's objections in their entirety. In the portion of his report pertinent to his appeal, the Regional Director stated that his investigation revealed that "Collins had three conversations with employees during the actual balloting in the election. However, all of the conversations were brief and did not involve any lengthy or sustained discussion. Thus, in two of the conversations, Collins told the voters he was glad to see that they had been able to come in to vote. In these conversations, there also was some brief discussion of the unusually heavy rainstorm that day. In the third conversation, which was not initiated by Collins, an employee asked Collins if he would be the union representative in the event Petitioner [the union] won the election, and Collins responded that he would accept the position if the employees chose him. The Board Agent conducting the elec-

tion interrupted the conversation at that point and nothing further was said." Based upon this evidence, the Regional Director concluded that "Collins' conversations with voters were so minor that they . . . do not warrant setting aside the election. Accordingly, it is recommended that this portion of the Employer's objections be overruled."

The Hospital subsequently filed exceptions to the Director's report insofar as it held that the three conversations recounted by the Director between Union observer Collins and prospective voters did not warrant overturning the election. Included in these exceptions was an affidavit by Erma Roseblock, the Hospital's election observer, in which she stated that Collins had participated in conversations with not three, but six prospective voters. Her recollection as to the content and approximate length of each of these conversations was set forth in the affidavit.[2]

On May 8, 1978 a three member panel convened pursuant to Section 3(b) of the NLRA[3], rejected the Hospital's exceptions, adopted the Director's findings and recommendations, and certified the Union. Thereafter, General Counsel for the Board issued a complaint alleging that the Hospi-

2. Erma Roseblock's affidavit described the six conversations she overheard as follows:

"At approximately 7:30 a. m. I observed Collins talking with Ann Drenner, a Licensed Vocational Nurse who was waiting to vote. There were approximately three or four other employees in line at the time. Ms. Drenner asked Collins whether he would be the Union representative if the Union got in. Collins replied that he would be if the employees wanted him. At this point the Board Agent conducting the election, Mr. Petering, interrupted the conversation and instructed Collins to say no more. He also admonished Collins not to talk with any more voters.

At approximately 3:15 p. m. I observed and heard Collins speak to Betty Mitchell, another LVN. I recall that he stated 'I am so glad that you made it in to vote because if you vote a yes, I won't be in so much trouble with the Hospital.' Ms. Mitchell replied that she had been off sick the night before. There were at least two or three other employees waiting in line to vote at that time.

At approximately 3:45 p. m. I observed Collins talking with Arlene Mason, a P.A., who was also in line waiting to vote. I recall that he said hello, and mentioned that it was raining

outside. He also asked her how she felt, and remarked that he was 'glad that she could make it in to vote.' She replied that she was glad to be able to come in, and would be back at work in a week or two. This conversation lasted approximately two minutes.

At approximately 3:50 p. m. I observed Collins speak with Brenda Woods, another P.A., saying hello, I am glad you came in to vote, it sure is raining hard.

At approximately 3:50 p. m. Collins also spoke with Leonard King, P.A. He said 'the weather was terrible, and that he was glad King could make it in to vote.'

At approximately 3:55 p. m. Calvin Prather, P.A., another voter came into the polling place with his young daughter. Collins engaged Prather in a conversation which lasted approximately about one minute, mostly concerning the weather and how attractive the daughter was."

3. Section 3(b) of the NLRA (Title 29 United States Code Section 153(b)) states in pertinent part "[t]he Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise."

tal had violated Section 8(a)(5) and (1) of the NLRA by refusing to bargain with the Union. The Hospital answered the complaint, admitting that it had refused to bargain, but denying the validity of the Board's certification of the Union. On September 22, 1978, the General Counsel filed a motion for summary judgment directly with the Board. The Board issued both an order transferring the proceeding to the Board and a Notice to Show Cause why the motion for summary judgment should not be granted. The Hospital filed its opposition to the motion.

The Board granted the General Counsel's motion for summary judgment on December 8, 1978, and found that the Hospital's refusal to bargain constituted an unfair labor practice within the meaning of Section 8(a)(5) and (1) of the NLRA. In addition, the panel concluded that it had already fully considered the Hospital's objections to the underlying representation election in the certification proceeding so that a hearing on the objections was not warranted.[4] The Hospital was ordered to cease and desist from the unfair labor practice found and was affirmatively directed to bargain with the Union upon request, and to post an appropriate notice to its employees stating the Hospital's intention to comply with the order. The Board seeks enforcement of this order.

This enforcement proceeding raises one basic issue: whether the statements made by the union observer to prospective voters constituted electioneering or were merely innocuous comments.

## II. *DISCUSSION*

### 1. *Effect of Erma Roseblock's Second Affidavit*

■ In support of its objections to the findings and recommendations of the Regional Director, the Hospital submitted an affidavit by its election observer Erma Roseblock to the Board. In that affidavit Erma Roseblock alleged that she overheard

six separate conversations between the Union's observer and Hospital employees waiting to vote. The Hospital's objections before the Board were two-fold: (1) that the three conversations specifically noted in the Regional Director's report amounted to impermissible electioneering and were not isolated, innocuous comments; and (2) that the Director had failed to consider all of the election-day conversations witnessed by Roseblock. The Board considered these objections, but adopted the Regional Director's findings and recommendations and certified the Union.

In urging this court to deny the Board's petition for enforcement, the Hospital reiterates the two arguments it urged unsuccessfully before the Board. In support of the latter of these two contentions, the Hospital has applied to this court for leave to present additional evidence in the form of a second affidavit by Erma Roseblock. In that affidavit Roseblock states that the information regarding all six conversations contained in her March 15th affidavit was the same information that she had previously provided to the Regional Director during his investigation. Prior to oral argument, the affidavit was ordered lodged with the court for such consideration as this panel deems appropriate.

The parties have spent considerable time and effort arguing whether this court should consider the second affidavit and the import of the information contained therein. Contrary to the contentions of the parties, we find it to be without effect on the outcome of this proceeding.

It cannot be inferred from the Board's decision and certification of May 8th that the Board failed or refused to consider each of the Hospital's exceptions to the conduct of the election, including the evidence supplied in Roseblock's affidavit of March 15th concerning all six election-day conversations. The Board stated that it had "reviewed the record in light of the exceptions

---

**4.** Title 29 Code of Federal Regulations, Section 102.69(d) provides that post election hearings are to be conducted only where the objecting

party raises "substantial and material factual issues."

and the brief." Further, the Board observed in a footnote that, "In our opinion the Employer's exceptions raise no substantial or material issue of fact or law requiring reversal of the Regional Director's findings, conclusions, and recommendations, or warranting a hearing." The clear inference to be drawn from this language is that the Board considered everything presented, including Roseblock's March 15 affidavit.

2. *Were the Statements Made by the Union Observer to Prospective Voters Isolated, Innocuous Comments?*

In *Michem, Inc.*, 170 N.L.R.B. 362 (1968), the Board promulgated a rule reflecting many years growth of federal labor policy. In earlier cases, the Board had recognized that election conditions must approach, as nearly as possible, ideal "laboratory" conditions so as to facilitate expression of "the uninhibited desires of the employees." *In re General Shoe Corp.*, 77 NLRB 124, 127 (1948). In *Michem*, the Board developed a more specific guideline by which interference with the desired "laboratory conditions" could be determined. The Board said that:

> "the potential for distraction, last-minute electioneering or pressure, and unfair advantage from prolonged conversations between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, without inquiry into the nature of the conversations. The final minutes before an employee casts his vote should be his own, as free from interference as possible. Furthermore, the standard here applied insures that no party gains a last minute advantage over the other, and at the same time deprives neither party of any important access to the ear of the voter. The difficulties of recapturing with any precision the nature of the remarks made in the charged atmosphere of a polling place are self-evident, and to require an examination into the substance and effect of the conversations seems unduly burdensome and, in this situation, unnecessary. Finally, a blanket prohibition

against such conversations is easily understood and simply applied ... *But this does not mean that any chance, isolated, innocuous comment or inquiry by an employer or union official to a voter will necessarily void the election. We will be guided by the maxim that 'the law does not concern itself with trifles.'"* (170 NLRB at 362-363.) (Emphasis added.)

The problem presented by this enforcement proceeding is where to draw the line between "prolonged conversations" on the one hand and "chance, isolated, innocuous comment" on the other.

■ In the instant case, court review of the representation election has been triggered by application of the Board for enforcement of its order under Title 29 United States Code, Section 160(e). Upon review of the record as a whole, this court must accept the findings of the Board as conclusive if they are supported by substantial evidence. 29 U.S.C. Section 160(e). *See also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). In addition, "the Board is presumed to have a certain expertise in conducting and evaluating elections; its decisions should be deferred to unless it has committed an abuse of discretion." *Hecla Mining Co. v. NLRB*, 564 F.2d 309, 313 (9th Cir. 1977). "... [T]o the extent that the Board's decision rests on findings of fact for which there is 'substantial evidence' on the record as a whole, this court must defer to that decision. *NLRB v. Mercy Peninsula Ambulance Service, Inc.*, 589 F.2d 1014, 1018 (9th Cir. 1979).

In contexts similar to that presented by the facts of this case, this court has deferred to the Board's expertise on numerous occasions. For example, in *Laborers and Hod Carriers Local No. 341 v. NLRB*, 564 F.2d 834, 837 (9th Cir. 1977) this court recognized that "[t]he line between merely routine exercises of authority [employees] and those requiring independent judgment [supervisor] is to be drawn by the Board; therefore, the courts usually defer to the Board's expertise." *Kaiser Engineers v.*

*NLRB*, 538 F.2d 1379, 1383–84 (9th Cir. 1976). Likewise, in *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir. 1972) this court deferred to the Board's determination of lack of good faith bargaining on the part of an employer, saying that "... a court will not lightly disregard the over–all appraisal of the situation by the Labor Board 'as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge ...' *NLRB v. Reed & Prince Mfg. Co.*, ... 205 F.2d at 134 (1st Cir. 1953), quoting *Universal Camera Corp. v. NLRB*, (1951) 340 U.S. 474, 488 [71 S.Ct. 456, 95 L.Ed. 456]."

In the instant case, the Regional Director found that "Collins' three conversations with voters during the election were brief and innocuous." In ruling on the Hospital's exceptions, the Board adopted the Regional Director's findings and recommendations. In so doing, the Board not only concurred in the finding that the three conversations were brief and innocuous, but also found that the Hospital's exceptions to the election, supported by Roseblock's affidavit which included reference to three additional conversations, "raised no substantial or material issue of fact or law." Therefore, impliedly the Board found all six conversations to be of the type referred to in *Michem* as "chance, isolated, innocuous comment or inquiry."

■ It is particularly appropriate that this Court defer to a decision of the Board when that decision is based upon an exercise of the Board's expertise in interpreting and applying its own standards for evaluating representation elections. The Board is in a better position to interpret what it mean by "innocuous comment" in *Michem* than this court. Furthermore, the Board's

evaluation is supported by substantial evidence. None of the six conversations reported was alleged to be of more than one or two minutes in length.[5] Most appear to have transpired in a matter of seconds. Four of the conversations were merely greetings coupled with comments on the weather. Of course, we recognize that even extremely short conversations can rise to the level of the election–day evils outlined in *Michem*. Directly exhorting an employee to vote one way or the other requires only three or four words and fewer seconds. However, when, as here, the statements consist of the kind of social pleasantries that can be expected from persons who work together, it is appropriate to evaluate their impact largely upon the length of the exchange. These four conversations were not the type of prolonged conversations as condemned in *Michem*.

Two of the conversations bore directly upon the election itself. One of these conversations consisted of an employee asking Collins whether Collins would be the Union Representative if the Union was approved. Collins replied succinctly that he would be if the employees wanted him. Collins commented in the other conversation that if the employee voted for the Union Collins would not be in so much trouble with the Hospital. Only the last related comment by Collins begins to approach the kind of electioneering condemned by *Michem*. We defer to the Board's finding that both comments were innocuous. Each of the conversations is an insufficient reason for overturning the election, and the six conversations do not present in the aggregate the "prolonged conversations" that the Board found in *Michem* to represent a "potential for distraction, last minute electioneering, and unfair

---

5. The additional authority cited by the Hospital, *Midwest Stock Exch. v. NLRB*, 620 F.2d 629 (7th Cir. 1980), is inapposite. In that case the Seventh Circuit held that the Board failed to apply its own *Michem* criteria. One of the election conversations in *Midwest Stock Exch.* was five–minutes long, a conversation length which the Board in *Michem* had already described as "prolonged." By upholding the election despite the conversation, the court con-

cluded that the Board had impermissibly departed from *Michem*. *Id.* at 633. The court overturned the election and denied the Board's application for enforcement.

The conversations in the instant case do not come close to approaching the five–minute mark of *Michem*. We are not presented with the question of the Board failing to apply its own guidelines.

advantage." We therefore conclude that the judgment of the Board that the election was properly held must be affirmed. Accordingly, the refusal of the Hospital to bargain constitutes an unfair labor practice within the meaning of Section 8(a)(5) and (1) of the NLRA.

The Application of the National Labor Relations Board for enforcement of its order is GRANTED.

CHOY, Circuit Judge, dissenting:

I respectfully dissent.

I believe that the "laboratory conditions" required in representative elections were violated by the union observer. See *Michem, Inc.*, 170 NLRB 362 (1968); *In re General Shoe Corp.*, 77 NLRB 124, 127 (1948).

The affidavit of Erma Roseblock describing the six conversations she overheard between Mark Collins, the union observer at the election, and employees waiting to vote was uncontroverted. During one of the two conversations, in which Collins was asked by voters regarding his position as the union representative if the union were elected, about three or four other employees were in the voting line; during the other such conversation there were two or three other voters. This means that a total of five to seven other persons, besides the ones immediately talking with Collins, in all probability heard the colloquies, and if they were partial to Collins were influenced to vote for the Union. In an election as close as this one was, the NLRB panel's conclusion that such communications did not warrant setting aside the election was error.

The chat between Collins and Arlene Mason about the weather, about how glad Collins was that Mason was there to vote, and regarding her ability to be back at work in a week or two, lasted about two minutes. The dialogue between Collins and Calvin Prather, who had brought his young daughter when he came to vote, lasted about one minute and concerned the weather and how

attractive the daughter was. In an election line, conversation of such duration is not minor or inconsequential in length.

The majority allows that the two conversations concerning Collins' prospects to become the Union representative if the Union were elected "bore directly upon the election itself." But they conclude that statements consisting of social pleasantries are of the type referred to in *Michem* as "chance, isolated, innocuous comment or inquiry" as the Board found them to be, and therefore insufficient for overturning the election.

The finding that such conversations and pleasantries were "chance, isolated, innocuous comment" and did not affect voters seems to me to be naive and clearly erroneous.* When a person such as Collins approached voters and engaged them in such colloquy, he obviously did so with the intent to ingratiate himself, and thereby the Union, with the voters and so influence their vote. Every politician engages in such activities while campaigning and that was what Collins was doing at the voters lineup.

The fact that Collins already had been warned by the NLRB agent that he should not converse with voters in line, but disregarded that admonition and talked with at least four others, evidences his calculated and persistent purpose to electioneer on behalf of the Union. That was hardly "chance, isolated or innocuous".

I echo here a part of what the majority quotes from *Michem* :

> [T]he potential for distraction, *last minute* electioneering or pressure, and unfair advantage from prolonged conversations between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to *warrant a strict rule against such conduct, without inquiry into the nature of the conversations.* The *final minutes* before an employee casts his vote should be his own, as

* I would not defer to the Board panel's "expertise" in a matter such as this which involves

merely ordinary human experience and nothing touching special labor–management concerns.

free from interference as possible. (Emphasis supplied.)

170 NLRB at 362.

This court has suggested in dictum that *Michem* be interpreted

as prohibiting both the company and the union "from carrying on conversations of any type in the polling area, or while employees wait in line to vote." *Roberts Tours, Inc. v. NLRB*, 578 F.2d 242 (9th Cir. 1978).

The laboratory conditions for voting having been defiled, I would sustain the Hospital's challenge of the election and deny enforcement of the Board's order.